# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMMY MOLINA, | ) 1:04-cv-5268-SMS |
| | ) |
| Plaintiff, | ) DECISION AND ORDER DENYING |
| | ) PLAINTIFF'S SOCIAL SECURITY |
| | ) COMPLAINT (DOC. 1) |
| v. | ) |
| | ) ORDER DIRECTING THE ENTRY OF |
| JO ANNE B. BARNHART, | ) JUDGMENT FOR DEFENDANT JO ANNE B. |
| Commissioner of Social | ) BARNHART, COMMISSIONER OF SOCIAL |
| Security, | ) SECURITY, AND AGAINST PLAINTIFF |
| | ) TAMMY MOLINA |
| Defendant. | ) |
| | ) |
| | ) |

Plaintiff is represented by counsel and is proceeding in forma pauperis with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (Act). Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the Magistrate Judge to conduct all proceedings in this matter, including ordering the entry of final judgment.[1] The matter is currently

---

[1] District Judge Robert E. Coyle assigned the case to the undersigned Magistrate Judge on July 2, 2004.

before the Court on the parties' briefs, which have been
submitted without oral argument to the Honorable Sandra M.
Snyder, United States Magistrate Judge.

## PRIOR PROCEEDINGS

On September 14, 2000, Plaintiff applied for a period of
disability and disability insurance benefits (DIB) under Title II
of the Act, alleging disability beginning on January 12, 2000,
due to neuropathy, thyroid disease, bone spurs, and anxiety
attacks. (A.R. at 132-34, 140.) Plaintiff's claim was denied
initially and on reconsideration. (Id. at 94, 119-22, 124-27.)
Plaintiff requested a hearing before an administrative law judge
(ALJ) of the Social Security Administration (SSA). On October 8,
2002, Plaintiff appeared with an attorney and testified before
the ALJ, James E. Ross. (A.R. at 18.) At a supplemental hearing
on February 11, 2003, vocational expert (VE) Judith Najarian
testified. On April 4, 2003, the ALJ denied Plaintiff's
application for benefits. (Id. at 18-24.) Plaintiff sought review
of the ALJ's decision by the Appeals Council. On December 10,
2003, the Appeals Council denied Plaintiff's request for review.
(A.R. at 6-9.)

On February 11, 2004, Plaintiff filed the complaint in the
instant action; the administrative record was lodged by Defendant
on June 24, 2004. On November 17, 2004, Plaintiff filed an
opening brief. On February 17, 2005, Defendant filed a brief in
opposition. On March 4, 2005, Plaintiff filed a reply brief.

## ADMINISTRATIVE FINDINGS

The ALJ found that although Plaintiff had an impairment of
combination of impairments that were severe, none met or equaled

a listing, and Plaintiff retained the residual functional capacity (RFC) to lift ten pounds occasionally or five pounds frequently; sit six of eight hours; stand or walk two of eight hours; but not to use foot controls or perform repetitive forceful pushing, pulling, or grasping with either upper extremity. Although Plaintiff was unable to perform any of her past relevant work, Plaintiff retained the RFC to perform a significant range of sedentary work such that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. Thus, Plaintiff was not disabled at any time on or before September 30, 2000, after which Plaintiff's insured status terminated. (A.R. at 22-24.)

<u>ISSUES PRESENTED</u>

Reference to the parties' briefs shows that the following issues are presented for decision:

1) Whether the ALJ failed properly to review the testimony;

2) Whether the ALJ failed properly to review Step 3, particular Listing 9.08, which was argued by counsel";[2]

3) Whether the ALJ failed to report and analyze multiple impairments at steps two and five;

4) Whether the ALJ failed to develop the mental health record;

5) Whether the ALJ failed properly to consider and weigh the opinions of treating neurologist Hylton regarding Plaintiff's hands;

6) Whether Plaintiff wrongly suggested collusion between

---

[2]Plaintiff's brief contains neither a statement of facts nor page numbers. It fails significantly to comply with the Court's scheduling order.

counsel and the doctors;

7) Whether restricting Plaintiff's hands to forceful activities is supported by substantial evidence, and whether "occasional" should be substituted; and

8) Whether the VE's testimony regarding limitations rendering a person disabled requires remand; and

9) Whether new, material evidence should be considered.

<u>FACTS</u>[3]

I. <u>Testimony</u>

At the October 8, 2002 hearing, Plaintiff, born on February 23, 1960, testified that she experienced constant tingling, pain, and numbness in her feet, legs, and knees (Tr. 67). She had swelling in her feet (Tr. 67). Plaintiff complained of tingling and pain in her hands and arms and cramping in her hands. (Tr. 67). She testified that she was unable to use her hands because of diabetic neuropathy; she could type or wash dishes for up to five minutes only and then would have to rest for twenty-five minutes before using them again. (Tr. 67-68). In 1999 when she stopped working she could use her hands for approximately two hours. (Tr. 68.)

She said she had constant back pain in 1999, which caused problems in her left foot and leg. (Tr. 69). She could stand for perhaps an hour back in 1999 when she stopped working. (Tr. 70.) She said she had been using a cane for approximately three weeks at the time of the hearing (Tr. 69-70). Sometimes she required assistance to get around. (Tr. 70.)

---

[3] The statement of facts is largely derived from Defendant's brief.

4

Plaintiff testified that in 1999 she had to lie down and elevate her legs for half an hour three times a day (Tr. 71). She said she was able to take walks in 1999 and less frequently in 2000, as she experienced increased pain with her neuropathy (Tr. 71).

Plaintiff said in 1999 and 2000, she was able to perform housework, such as washing dishes, sweeping, making the beds, but had difficulty with these activities (Tr. 71-72). She said she dropped dishes because of cramping in her hands (Tr. 72). She said in 1999 she could only concentrate for an hour to an hour and a half at a time due to pain (Tr. 73). She could no longer read, do puzzles, draw, fish, or camp. Plaintiff said she could no longer go grocery shopping or do laundry by herself and had stopped in 2001.  (Tr. 73-74).

Plaintiff took medication for anxiety and depression and had difficulty remembering things. (Tr. 75.)

In the six months before the hearing, Plaintiff had cut her driving to once a day because of her hands. She had last worked in November 1999, but the doctor had taken her off work for two weeks because of her diabetes, and she never returned because the doctor decided she was permanently disabled. (Tr. 66-67.)

The record remained open for ten days for clarification of date of onset by Plaintiff's doctor. (Tr. 75.)

At the February 11, 2003 supplemental hearing, Plaintiff's attorney and a vocational expert were present. Plaintiff was not present as she had already given her testimony at the prior hearing (Tr. 80). The vocational expert testified that with Plaintiff's residual functional capacity, a significant number of

1 sedentary jobs existed which Plaintiff could perform (Tr. 85-86).

2     The RFC and restrictions that the ALJ posed to the VE were

3 sedentary work, sitting six of eight hours and on her feet

4 intermittently for an additional two hours; lifting and carrying

5 ten pounds occasionally and five pounds frequently; no use of

6 foot controls or standing on uneven terrain; no repetitive,

7 forceful grasping, pushing, or pulling with either extremity.

8 (Tr. 84.) The VE testified that Plaintiff could perform

9 cashiering, sedentary and unskilled, 15,676 positions in

10 California and 141,770 in the United States; various production

11 jobs, such as waxer, jewel stringer, hand washer, folder, etc.,

12 sedentary, 6,630 in California and 66,233 in the United States

13 but reduced fifty per cent because of the restriction against

14 forceful grasping; and unskilled assembly jobs, sedentary, 10,977

15 positions in California and 103,841 in the United States reduced

16 by fifty per cent for forceful pinching, pushing or grasping.

17 (Tr. 84-86.) The ALJ stated that he imposed the forceful

18 limitation because there was not much evidence of peripheral

19 neuropathy in her hands or upper extremities, as distinct from

20 her legs, but to err on the side of safety he imposed such a

21 limitation. (Tr. 86-87.)

22     The VE testified that if there was a limitation to only

23 occasional feeling, it would eliminate all the jobs. If there

24 could be only occasional simple grasping and fine manipulation,

25 the jobs could not be performed. (Tr. 87-88.) If there were a

26 sit/stand alternative required, Plaintiff could still perform the

27 cashier position, but the assembly jobs would be difficult. If

28 there was bladder incontinence requiring hourly bathroom visits,

1  there would be a reduction (unspecified in extent). (Tr. 88-89.)
2  None of the cashier jobs involved exposure to environmental
3  irritants, but if Plaintiff were restricted to only moderate or
4  occasional exposure to environmental irritants, then the assembly
5  and production jobs would be eroded ten to twelve per cent. (Tr.
6  90.) Elevating legs about a foot would be possible in all the
7  jobs, but not if it involved elevation that was parallel, which
8  would throw off body mechanics. (Tr. 91.)

9      Plaintiff and the ALJ agreed that Plaintiff's date of last
10 being insured was September 30, 2000. (Tr. 63, 18.)

11     II. <u>Medical Evidence</u>

12     Medical records dated November 1999 to February 2001 showed
13 that Plaintiff was treated for multiple medical problems,
14 including diabetes mellitus, diabetic neuropathy, hypothyroidism,
15 and low back pain (Tr. 257-275, 286-289, 291, 293-294, 299-302,
16 305). In the most recent treatment records dated February 2001,
17 Robert Hernandez, M.D. treated Plaintiff for sinusitis and
18 allergic rhinosinusitis (Tr. 257). Dr. Hernandez noted that
19 Plaintiff's asthma was well-controlled, her hypothyroidism was
20 stable and her peripheral neuropathy was improved with
21 medication. Plaintiff was continued on medications for these
22 conditions as well as for her low back pain, depression, and
23 anxiety. Plaintiff was given a urology referral for complaints
24 of urinary stress incontinence. In a letter dated February 2,
25 2001, Dr. Hernandez indicated that Plaintiff was disabled due to
26 her multiple medical problems (Tr. 258).

27     On January 12, 2000, Plaintiff was referred to Diana J.
28 Hylton, M.D., a neurologist, after complaints of numbness and

7

burning pain in both feet (Tr. 250-251, 258-259, 337-338).
Plaintiff was diagnosed with early peripheral neuropathy, and was
given medication samples for symptomatic control (Tr. 250). Dr.
Hylton also requested that Plaintiff's employer restrict her
standing to no more than three hours per day total and preclude
her from constant standing, in order to help relieve her leg pain
(Tr. 251, 252, 338).

In February 2000, Plaintiff was referred to a podiatrist for
care after complaints of left heel pain (Tr. 334, 336). Plaintiff
received a cortisone injection (Tr. 334).

In March 2000, a treadmill exercise stress test and
echocardiographic study showed the presence of arrhythmias and
chest pain (Tr. 331-332). Plaintiff subsequently underwent a
heart catheterization and coronary arteriography which
demonstrated normal findings (Tr. 168-169, 219-220, 329-330). A
chest x-ray was normal (Tr. 222). A medical record dated July
2000 noted complaints of low back and left foot pain (Tr. 246).
A MRI showed minimal degenerative changes at the T-12, L-1 disc
levels (Tr. 246, 327).

Medical records dated December 2000 showed that Plaintiff
received emergency treatment for complaints of cough and
shortness of breath (Tr. 202-214). Plaintiff was diagnosed with
pneumonia, chronic obstructive pulmonary disease, diabetes,
hypothyroidism, peptic ulcer disease, hypertension, and
depression. She was continued on medications (Tr. 204-205).
Laboratory testing showed no myocardial injury (Tr. 206).

On December 21, 2000, the State Agency physician recommended
restrictions generally compatible with sedentary work (Tr. 179-

186).

On December 21, 2000, Charles House, Ph.D., a consultative psychologist, diagnosed Plaintiff with mood disorder, NOS, without suicidal ideation (Tr. 176-185). Dr. House opined that Plaintiff would have no difficulty in performing simple and repetitive tasks as well as detailed and complex tasks, accepting instructions from supervisors, interacting in an acceptable way with coworkers and the general public, maintaining regular attendance in the workplace, and completing a normal workday without interruptions (Tr. 177-178).

On January 4, 2001, the State Agency psychiatrist opined that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and insufficient evidence to determine the degree of limitation in decompensation in a work setting (Tr. 240-242).

In a letter dated February 27, 2001, Dr. Hylton opined that Plaintiff was unable to stand more than three hours per day and was precluded from repetitive hand use during the day due to peripheral neuropathy secondary to diabetes mellitus (Tr. 244, 321). Dr. Hylton noted that Plaintiff's pain was controlled with medication. Dr. Hylton also remarked that because of chronic pain, Plaintiff suffered from depression for which she took medications (Tr. 244, 321).

In April 2001, the State Agency physician recommended restrictions generally compatible with sedentary work (Tr. 307-314). The State Agency psychiatrist determined that Plaintiff had a medically determinable impairment of some depression and

anxiety due to physical problems, with mild restriction of
activities of daily living, mild difficulties in maintaining
social functioning, mild difficulties in maintaining
concentration, persistence, or pace, and no episodes of
decompensation in a work setting (Tr. 315-318).

Medical records from Dr. Hernandez dated April 2001 to
September 2002 indicated that Plaintiff was treated for
cellulitis of the right inguinal area, smoking cessation, an
abscessed tooth, diabetes mellitus, hypothyroidism, low back
pain, hypertension, and peripheral neuropathy (Tr. 340, 344-346,
349-350, 357-361, 364, 368). It was noted in April 2002 that
Plaintiff's pain crisis may have been caused by diabetic
neuropathy or withdrawal from opiates due to Plaintiff's
temporarily stopping her medications (Tr. 346).

In a Complete Medical Report (Physical) dated September 19,
2002, Dr. Hylton opined that Plaintiff had disabling physical
limitations due to peripheral neuropathy (Tr. 372-376). On
September 27, 2002, Plaintiff underwent a nerve conduction study
of the lower extremities. Dr. Hylton concluded that there was
moderate severe peripheral neuropathy primarily affecting the
lower limbs (Tr. 369-370).

In a Complete Medical Report (Physical) dated September 30,
2002, Dr. Hernandez opined that Plaintiff could lift or carry ten
pounds frequently and twenty pounds occasionally and carry up to
20 pounds occasionally, sit for a total of four hours in an
eight-hour workday, stand/walk for a total of two hours in an
eight-hour workday, occasionally perform simple grasping and fine
manipulations, occasionally use her feet bilaterally, with

1   additional postural and environmental restrictions (Tr. 377-381).

2       On October 8, 2002, in response to Plaintiff's attorney's

3   letter requesting a specific disability onset date with respect

4   to the previously completed Medical Report questionnaire, Dr.

5   Hernandez indicated that Plaintiff had been disabled since

6   January 12, 2000 (Tr. 383). Similarly, in response to the same,

7   Dr. Hylton indicated that Plaintiff's disability onset date was

8   January 12, 2000 (Tr. 383, 387).

9                              ANALYSIS

10      I. Disability

11      In order to qualify for benefits, a claimant must establish

12  that she is unable to engage in substantial gainful activity due

13  to a medically determinable physical or mental impairment which

14  has lasted or can be expected to last for a continuous period of

15  not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).

16  A claimant must demonstrate a physical or mental impairment of

17  such severity that the claimant is not only unable to do the

18  claimant's previous work, but cannot, considering age, education,

19  and work experience, engage in any other kind of substantial

20  gainful work which exists in the national economy. 42 U.S.C.

21  1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th

22  Cir. 1989).

23      The burden of establishing a disability is initially on the

24  claimant, who must prove that the claimant is unable to return to

25  his or her former type of work; the burden then shifts to the

26  Commissioner to identify other jobs that the claimant is capable

27  of performing considering the claimant's residual functional

28  capacity, as well as her age, education and last fifteen years of

                              11

1  work experience. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir.
2  1990).

3      The regulations provide that the ALJ must make specific
4  sequential determinations in the process of evaluating a
5  disability: 1) whether the applicant engaged in substantial
6  gainful activity since the alleged date of the onset of the
7  impairment, 20 C.F.R. § 404.1520 (1997);[4] 2) whether solely on
8  the basis of the medical evidence the claimed impairment is
9  severe, that is, of a magnitude sufficient to limit significantly
10 the individual's physical or mental ability to do basic work
11 activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the
12 basis of medical evidence the impairment equals or exceeds in
13 severity certain impairments described in Appendix I of the
14 regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant
15 has sufficient residual functional capacity, defined as what an
16 individual can still do despite limitations, to perform the
17 applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and
18 5) whether on the basis of the applicant's age, education, work
19 experience, and residual functional capacity, the applicant can
20 perform any other gainful and substantial work within the
21 economy, 20 C.F.R. § 404.1520(f).

22     II. <u>Multiple Impairments at Steps Two and Five</u>

23     Plaintiff argues that the ALJ omitted impairments in
24 determining the severity of Plaintiff's impairments and
25 Plaintiff's RFC. Plaintiff argues that a number of medical
26 conditions that she suffered were not expressly factored into the

27

28
_____

[4] All references are to the 2003 version of the Code of Federal Regulations unless otherwise noted.

12

ALJ's consideration at steps two and five of the sequential analysis.

Preliminarily the Court notes that paragraph 11 of the Court's scheduling order dated February 11, 2004, states that an opening or responsive brief shall contain a short, separate statement of each of appellant's legal claims stated in terms of the insufficiency of the evidence to support a particular finding of fact or reliance upon an erroneous legal standard; and argument separately addressing each claimed error, which must be supported by citation to legal authority and explanation of the application of such authority to the facts of the particular case. (<u>Id.</u> at ¶ 11(e), (f).) Further, it states that all references to the record and all assertions of fact must be accompanied by citations to the record. (¶ 11.)

Here, Plaintiff does not cite authority requiring the ALJ to make express findings about every medical condition suffered by Plaintiff, regardless of its longevity or the nature or extent of its effect on Plaintiff's ability to work. Plaintiff does not otherwise explain how the law requires the ALJ to do so in this instance. Plaintiff cites (actually mis-cites point page and year in one case, and omits a point page citation in the other) to two cases, <u>Cox v. Califano</u>, 587 F.2d 988 (9th Cir. 1978) (instructing that an ALJ must be careful to elicit unfavorable as well as favorable evidence where a claimant is not represented by counsel at a hearing), and <u>Taylor v. Heckler</u>, 765 F.2d 872 (9th Cir. 1985). Neither of these cases addresses the Plaintiff's assertion regarding multiple impairment analysis or the extent of an ALJ's obligation to make express findings.

In order to be disabled, one must suffer from an impairment
or combination thereof that is severe, which means that it
significantly limits one's physical or mental ability to do basic
work activities. 20 C.F.R. § 404.1520(c). Basic work activities
include the abilities and aptitudes necessary to do most jobs,
such as physical functions of walking, standing, sitting,
lifting, pushing, pulling, reaching, carrying, or handling;
capacities for seeing, hearing, and speaking; understanding,
carrying out, and remembering simple instructions; use of
judgment; responding appropriately to supervision, co-workers,
and usual work situations; and dealing with changes in a routine
work setting. 20 C.F.R. § 404.1521(b). If the evidence
establishes that one's impairment or combination thereof was only
a slight abnormality that had no more than a minimal effect on an
individual's ability to work, it is not severe. See Smolen v.
Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). The Secretary is
required to "consider the combined effect of all of the
individual's impairments without regard to whether any such
impairment, if considered separately, would be of [sufficient
medical] severity." 42 U.S.C. § 1382c(a)(3)(F).

For purposes of disability analysis, either a mental or
physical impairment is a basis for disability where it is
medically determinable, that is, it results from anatomical,
physiological, or psychological abnormalities which can be shown
by medically acceptable clinical and laboratory diagnostic
techniques and established by medical evidence consisting of
signs, symptoms, and laboratory findings, as distinct from a
statement of symptoms. 20 C.F.R. §§ 404.1505(a), 404.1508. An

14

impairment must have lasted or must be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509.

Plaintiff has the burden to produce sufficient evidence that he or she actually suffers from an impairment, or else it need not be factored in to a disability analysis. Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996). Where the evidence is not sufficient to suggest that a claimant suffered multiple impairments, or a combination thereof, then it is not error to fail to do a multiple impairment analysis. Macri v. Chater, 93 F.3d 540, 545 (9th Cir. 1996) (where the evidence did not establish that medication for a claimed impairment was prescribed during the claimant's period of disability insurance covered status).

In determining whether an individual's impairments are of sufficient medical severity that they could be the basis of eligibility for benefits, the Commissioner shall consider the combined effect of all the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1545(e), 416.945(3); Soc. Sec. Ruling 96-8p. The ALJ is responsible for determining the effect of an impairment upon the other impairments and its effect on the claimant's ability to work and general health. Celaya v. Halter, 332 F.3d 1177, 1182 (9th Cir. 2003). An ALJ must adequately explain his evaluation of the combined effects of impairments. Marcia v. Sullivan, 900 F.2d 172, 176 (9th Cir. 1990) (holding that a finding that the claimant had failed to provide evidence of medically determinable

impairments that met or equaled the listings or duration requirements of the Act was not sufficient adequately to explain the evaluation of alternative tests and the combined effects of the impairments).

Here, the ALJ noted Plaintiff's treatment for diabetes, peripheral neuropathy of the upper and lower extremities, hypothyroidism, low back pain with sciatica, right wrist and forearm strain, generalized anxiety disorder, cardiac condition, and bone spurs. (A.R. at 19-20.) He concluded that as of September 30, 2000, Plaintiff's diabetes with neuropathy of both lower extremities and her low back pain, etiology unclear, were severe impairments; her hypothyroidism, mood disorder, and mild peripheral neuropathy in both upper extremities were non-severe. (Id. at 20.) Plaintiff's claim that the ALJ failed to address these impairments is clearly meritless.

In support of Plaintiff's assertion that her obesity should have been but was not evaluated, she cites to page 268 of the administrative record, which contains no diagnosis of obesity and instead simply indicates Plaintiff's weight of 210 pounds. Plaintiff cites to no evidence that she was diagnosed as obese or that her weight, either in addition to or as distinct from her other musculoskeletal and cardiovascular conditions, resulted in any symptoms or any effect on her ability to work.

At the administrative level, Plaintiff had counsel who argued impairment under listing 9.08 consisting of diabetes and dysfunction of the extremities or sufficiently severe problems with her hands such that she would be disabled "within the framework of Section 201.00H," concerning individuals restricted

to sedentary work with various other circumstances. Even at the Appeals Council level, where Plaintiff complained of the ALJ's failure to consider bladder stress incontinence, asthma, migraines, and TMJ, Plaintiff did not mention her obesity (A.R. at 62, 76, 385-86.) It is appropriate to find that Plaintiff, represented by counsel, has waived this issue. No circumstances suggesting manifest injustice appear. Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999).

Alternatively, as is the case with many other medical conditions or symptoms, obesity is not an impairment simply because it exists or existed at some point in time; rather, it is evaluated with respect to its effect on the claimant and may constitute an impairment under current regulations only if it has a sufficient effect upon a claimant's musculoskeletal, respiratory, or cardiovascular system. Celaya v. Halter, 332 F.3d 1177, 1181 n.1 (2003). It has been held that obesity had to be considered in combination with hypertension and diabetes despite its not being an impairment claimed by a pro se plaintiff where the record revealed that the plaintiff suffered from obesity and where it was logical that the impairment may have itself not been severe but might in combination have been severe. Celaya v. Halter, 332 F.3d 1177, 1182 (9th Cir. 2003) On the other hand, in Celaya, it was held permissible not to factor in to a multiple impairment analysis headaches that the ALJ found were attributable to, and thus might have been treated in conjunction with, another impairment, high blood pressure, because Plaintiff had failed to provide sufficient evidence of the effect of the impairment. See, Celaya v. Halter, 332 F.3d 1177, 1181 (9th Cir.

17

2003).

Here, the ALJ evaluated all Plaintiff's symptoms relating to her cardiovascular system, and he also evaluated her musculoskeletal symptoms without regard to their etiology. Plaintiff failed to present evidence that Plaintiff suffered any impairment based on her weight. The ALJ did not err in failing expressly to factor in Plaintiff's weight in his impairment analysis.

Although Plaintiff did suffer foot pain and plantar fascitis in 2000, she was administered steroid injections for it, and orthotics and supports were recommended and used. (A.R. 263, 286, 334.) Plaintiff has not shown that she suffered from this condition, as distinct from her neuropathy, any limitation of her ability to work of the requisite duration.

Plaintiff did report suffering three months of sharp chest tightness and shortness of breath in February 2000. She was diagnosed with mitral valve prolapse with 1+ mitral regurgitation as shown in an echocardiogram in March 2000 (A.R. at 332); however, after a treadmill test and cardiac catheterization, left ventriculography, and coronary arteriography, the conclusion was that Plaintiff had normal coronary arteries, normal left ventricular contractile pattern and ejection fraction, and normal left heart hemodynamics. (A.R. at 329-30.) Plaintiff has not demonstrated that she suffered any limitation of her ability to work from this condition. Likewise, Plaintiff has not shown that her hypertension, diagnosed at that time (A.R. at 335), resulted in any limitation of her ability to work.

Plaintiff's stress incontinence was characterized as

episodic by Plaintiff and her treating physician in January 2000 (A.R. 337); there is no showing that Plaintiff was treated by Dr. Hylton for it at that time. Plaintiff further cites to treatment records of January 2001, made significantly after expiration of Plaintiff's insured status, indicating that Plaintiff reported stress urinary incontinence to Dr. Hernandez, who noted symptoms of overactive bladder as well and treated Plaintiff's symptoms with Sudafed 12 hour bid. He stated that he would later re-evaluate. (A.R. at 260.)

As to Plaintiff's dysfunctional uterine bleeding, the record cited by Plaintiff (A.R. at 271) shows that Plaintiff's uterine bleeding was well controlled with Ortho Tricyclen as of December 1999. By February 11, 2000, Plaintiff's treating physician described it as "resolved," and most likely due to severe hypothyroid state a few months previously. (A.R. at 268.) Neither condition is shown to have resulted in any limitation of Plaintiff's ability to work.

Plaintiff contends that her migraine headaches should have been evaluated. Plaintiff's only citation to a record of treatment or diagnosis is A.R. 217, a record of an emergency visit for a migraine headache and flu symptoms on September 27, 2000. Again, Plaintiff has not shown that her having suffered a migraine headache once at the very end of her insured period resulted in any limitation of her ability to work or was logically or actually expected to have done so.

Again, Plaintiff's status post crushed hand condition, diagnosed as a right wrist forearm strain (A.R. 288), was suffered in March 2000. However, x-rays were negative, and

19

movement was not shown to have been significantly impaired after a short period of time. (A.R. 291, 289, 287.)

With respect to Plaintiff's COPD and allergies, Plaintiff cites to records of treatment occurring after September 2000. Plaintiff has not shown that she suffered this condition before she contracted bronchitis and pneumonia in November and December 2000; further, she has not shown that she suffered any limitations from this condition with respect to her ability to work.

Although Dr. Allumbaugh diagnosed peptic ulcer disease in Plaintiff on December 25, 2000, upon a report of having had tests done for it in the past, Plaintiff has not established that she suffered symptoms or any limitations therefrom on her ability to work during the pertinent time period; Plaintiff cites only to A.R. 204, which shows that Plaintiff was prescribed "prophylactic Pepcid."

Plaintiff asserts that she suffered right leg cellulitis with atrophy and edema. She cites to A.R. 248 and 250; although some unspecified atrophy is referred to, and not all entries are legible, there does not appear to be any diagnosis of cellulitis of the right leg on those pages. Plaintiff has not demonstrated that any such condition of her right leg produced any limitation of Plaintiff's ability to work.

As to her hepatosplenomegaly, Plaintiff has not shown that it arose earlier than the summer of 2001; thus, the ALJ, who expressly concluded that the records were completed long after her last insured date (September 2000) (A.R. at 20), impliedly concluded that it was not probative of her condition at the

requisite period of time. Likewise, Plaintiff cites to A.R. 368 in connection with her TMJ syndrome; however, that was a record of treatment on July 21, 2001, also a time long after Plaintiff's last insured date.

In summary, the Court concludes that Plaintiff has failed to demonstrate that the ALJ erred in his analysis of Plaintiff's impairments at step two.

With respect to step five, Plaintiff's RFC, under Ninth Circuit law the ALJ must consider all factors that might have a significant impact on an individual's ability to work. Erickson v. Shalala, 9 F.3d 813, 817 (9th Cir.1993) (citing Varney v. Secretary of HHS, 846 F.2d 581, 585 (9th Cir. 1987)). Where there is a medical opinion that indicates/suggests that an impairment has an effect on a claimant's ability to work, the impairment must be figured into the RFC analysis. See Beecher v. Heckler 756 F.2d 693, 695 (9th Cir. 1985).

Here, given the lack of evidence that any of the conditions not expressly included in the analysis had any actual effect on Plaintiff's ability to work, the Court concludes that Plaintiff has not demonstrated any error in the scope of the ALJ's analysis or findings regarding RFC.[5]

III. Rejection of Dr. Hylton's Opinion

Plaintiff attacks the ALJ's rejection of treating physician Hylton's opinion that Plaintiff was disabled due to limitations and decreased capacity to use her hands to any practicable extent.

_____

[5] To the extent that Plaintiff attacks the propriety of the ALJ's factual findings, those contentions are separately considered in the remainder of the analysis.

The ALJ noted Dr. Hylton's opinion that on January 12, 2000, Plaintiff suffered early peripheral neuropathy that was moderately symptomatic of pain, for which Plaintiff was treated with Neurontin, and that Plaintiff could not stand constantly or for more than three hours total. (A.R. at 19.) He also noted Exhibit 15F (A.R. 20, 369-376), consisting of 1) test results showing Dr. Hylton's impression that Plaintiff had moderate severe peripheral neuorpathy primarily affecting the lower limbs as of September 27, 2002; and 2) Dr. Hylton's complete medical report of September 19, 2002, indicating that Plaintiff could never lift up to ten pounds, could sit three hours, stand/walk one hour, lie/elevate three hours, never engage in fine manipulation, only use the right foot and engage in simple grasping occasionally, never climb or balance and only occasionally stoop, crouch, kneel, and crawl, and only occasionally reach, handle, feel, push, and pull. The ALJ stated:

> The undersigned pointed out these records were not helpful since all were completed long after her date last insured. Claimant's representative then obtained and submitted Exhibit 17F, pp. 2-3, using leading language to focus upon the critical time period before the date last insured. The documents consisted of a filled-in handwritten date on a form signed by both Drs. Hylton and Hernandez indicating that claimant had been disabled since January 12, 2000. These opinions are inconsistent with the clinical and laboratory findings in the record, and are not entitled to special weight. Moreover, the manner in which the documents were prepared and obtained, as well as the fact that both doctors found and (sic) onset date on January 12, 2000 (two days prior to claimant's application) suggest collusion.

(A.R. at 20.)

An ALJ may disregard a treating physician's opinion whether or not it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). For example, an ALJ may reject a treating

physician's opinion that is brief and conclusionary in form with little in the way of clinical findings to support its conclusion. Id.

An ALJ may disregard a treating physician's opinion that is controverted by other opinions only by setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989). This burden is met by stating a detailed and thorough summary of the facts and conflicting clinical evidence, stating the interpretation of the evidence, and making findings. Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir 1986). However, if the medical opinion of a claimant's treating physician is uncontroverted, then an ALJ must present clear and convincing specific reasons, supported by substantial evidence in the record, for rejecting the uncontroverted medical opinion of a claimant's treating physician. Holohan v. Massanari, 246 F.3d 1195, 1203 (9th Cir. 2001). It is insufficient to rely on the inability of the physician to support the findings with objective laboratory findings because disability may be proved by medically acceptable clinical diagnoses as well as by objective laboratory findings. Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989). A failure to set forth a reasoned rationale for disregarding a particular treating physician's findings is legal error. Cotton v. Bowen, 799 F.2d at 1408.

The ALJ's conclusion that the records from 2002 were not helpful as being distant in time is supported by substantial evidence; further, such a finding is legally appropriate because the opinion of a physician who examines the claimant after the

1 expiration of his disability insured status is entitled to less

2 weight than an opinion rendered pursuant to a contemporaneous

3 exam. Macri v. Chater, 93 F.3d 540, 545 (9th Cir. 1996).

4     Substantial evidence supported the ALJ's conclusion that the

5 post hoc conclusion of Dr. Hylton was not entitled to special

6 weight because it was inconsistent with the clinical and

7 laboratory findings in the record. Dr. Hylton's findings at the

8 pertinent time in January 2000 included only early peripheral

9 neuropathy that was moderately symptomatic; her only restriction

10 was asking Plaintiff's employer to avoid constant standing and to

11 restrict standing to no more than three hours total. (A.R. at

12 252.) Even later, in February 2001, the only additional

13 restriction imposed by Dr. Hylton was avoidance of any type of

14 repetitive hand use during the day for pain management. (A.R. at

15 244, 321.) This is clearly inconsistent with a conclusion that

16 Plaintiff was unable to perform all full-time work.

17     Further, other ample and significant opinion evidence

18 existed supporting more minimal restrictions based on the

19 symptoms noted, including 1) the state agency physician's

20 recommendation in December 2000 of sedentary work with standing

21 and walking for two hours, sitting for six, and limited pushing,

22 pulling, feeling, and use of the lower extremities, and

23 occasional postural limitations, (A.R. at 179-86); and state

24 agency physician Vance Thornburg's opinion of April 2001 finding

25 Plaintiff capable of sedentary work with similar limitations,

26 (A.R. at 315-318). The ALJ's reasons for rejecting Dr. Hylton's

27 opinions were sound and legitimate, and even clear and

28 convincing.

Plaintiff complains that the record does not support the suggestion of collusion. It is appropriate for an ALJ to reject a physician's opinion where there is evidence that the physician has become an advocate for the patient's position. Matney on behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) (physician's opinion rejected because of lack of support by specific findings and physician's agreement to become an advocate); Saelee v. Chater, 94 F.3d 520, 522-23 (9th Cir. 1996) (concluding that an ALJ had appropriately rejected a doctor's opinion because the doctor's report was rendered solely for the purposes of the administrative hearing, varied from the doctor's own treatment notes, and was worded ambiguously in an apparent attempt to assist the claimant in obtaining social security benefits). Although in some circumstances the mere purpose for which a report is obtained is not sufficient to reject an opinion, it is appropriate to consider the additional circumstance that a report was rendered in response to solicitation by the claimant's counsel. Saelee v. Chater, 94 F.3d at 522-23.

Here, given counsel's involvement in the process, the inconsistency of the opinion with the physician's own previous opinions and findings, the identical date chosen by both physicians, and Dr. Hylton's apparent interest in Plaintiff's progress in obtaining benefits as demonstrated by her note that Plaintiff's SSI was denied in February 2001 (A.R. 322), the Court cannot say that the record fails to support the ALJ's inference. However, the Court concludes that the unexplained inconsistency of the later opinions of Dr. Hylton with her previous opinions

constitutes an independent and sufficient ground for the ALJ's conclusion.

IV. Listing 9.08

The ALJ stated that Plaintiff argues that the ALJ failed properly to review Listing 9.08[6] by making a conclusory statement to the contrary without analyzing the listing or any other listed impairment.

It is Plaintiff's burden to establish that his impairment met a listing. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). Mere diagnosis of a listed impairment is not sufficient to sustain a finding of disability; there must also be the findings required in the listing. Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 416.925(d). Generally, specific medical findings are needed to support the diagnosis and the required level of severity. 20 C.F.R. §§ 404.1525(c)-(d), 416.925(c). It has been held that it is not necessary for the ALJ specifically to state what evidence supports the conclusion that the claimant's impairments do not meet or exceed a listing; rather, it is sufficient for an ALJ to summarize the pertinent record, including the doctor's information regarding symptoms and the claimant's testimony, and to make specific findings essential to the conclusion such that a reviewing court may know the basis for the conclusion. It is unnecessary to require the Commissioner, as a matter of law, to state why Plaintiff failed to satisfy every listing. Gonzalez v. Sullivan, 914 F.2d 1197,

---

[6] Listing 9.08 covers diabetes mellitus with either acidosis of stated frequency, retinitis proliferans, or demonstration of neuropathy by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station.

1  1200-01 (9th Cir. 1990).

2      Here, the ALJ covered the evidence in detail in the opinion,

3  and it is clear that the ALJ's analysis of the evidence resulted

4  in a conclusion that Plaintiff suffered impairments, but that

5  Plaintiff's impairments were not disabling. Plaintiff has not

6  demonstrated or even argued that the ALJ's finding that

7  Plaintiff's impairments did not meet or equal those listings was

8  erroneous because of application of incorrect law or lack of

9  substantial evidence. The fact that Plaintiff had some symptoms

10  relating to a listing did not establish that her impairments met

11  or equaled a listing.

12      V. Rejection of Plaintiff's Subjective Complaints

13      Plaintiff argues that the ALJ's rejection of Plaintiff's

14  complaints of pain were unsupported by substantial evidence, and

15  that it was incomplete. Further, the ALJ asked Plaintiff no

16  questions.

17      Plaintiff has cited no authority requiring an ALJ to ask a

18  claimant questions at a hearing, particularly when the claimant

19  is represented by counsel.

20      As to subjective claims, it is established that the

21  existence and severity of a person's reaction to a physical

22  ailment, such as the existence and severity of pain, are

23  subjective phenomena, the extent of which cannot be objectively

24  measured. Byrnes v. Shalala, 60 F.3d 639, 642 (9th Cir. 1995). In

25  order to reject a claimant's subjective complaints, the ALJ must

26  provide specific, cogent reasons for the disbelief. Lester v.

27  Chater, 81 F.3d 821, 834 (9th Cir. 1995). Once the claimant

28  introduces medical evidence of an underlying impairment that

could reasonably be expected to produce some degree of the subjective symptoms, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence such as objective medical findings. Id.; Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). Unless there is affirmative evidence tending to show that the claimant is malingering, the reasons for rejecting the claimant's testimony must be clear and convincing, and the ALJ must set forth the rejection by identifying what testimony is not credible and what evidence undermines the claimant's complaints. Lester v. Chater, 81 F.3d at 834. The findings of the adjudicator must be properly supported by the record and must be sufficiently specific to allow a reviewing court to conclude that the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony. Bunnell v. Sullivan, 947 F.2d 341, 345-46; Byrnes v. Shalala, 60 F.3d at 641-42 (9th Cir. 1995); see 20 C.F.R. § 404.1529(c) [disability] and 20 C.F.R. § 416.929(c) [supplemental security income].

Social Security Ruling 96-7p directs the adjudicator to consider not only objective medical evidence of signs, laboratory findings, and medical opinions, but also the following factors when assessing the credibility of an individual's statements:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and adverse side effects of any medication for pain or other symptoms;
5. Treatment, other than medication, for relief of pain or other symptoms;

6. Any measures other than treatment used by the individual to relieve the pain or other symptoms; and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

See also Bunnell v. Sullivan, 947 F.2d at 346.

The ALJ reviewed the many subjective claims of Plaintiff set forth in her testimony, including her failure to drive for six months due to hand cramps, experiencing tingling on the bottom of her feet, numbness radiating into her legs, inability to do dishes more than five minutes, inability to use her hands for eight hours in 1999, constant back pain and sharp, shooting leg pain, use of a cane, ability to stand for only one hour, several daily rest periods in 1999, decreased ability to take walks in 2000, inability to concentrate over an hour and one-half or to remember things, and cessation of reading, drawing, fishing, camping, laundry, and shopping. (A.R. 20.)

The ALJ's reasons for concluding that Plaintiff's testimony did not credibly demonstrate that she was totally precluded from all sustained work activity on or before September 30, 2000, were clear and convincing and were supported by substantial evidence. Substantial evidence supported his conclusion that Plaintiff received primarily conservative outpatient care for her diabetes with good control of symptoms through the greater part of the pertinent time period. (A.R. 21, 300, 293, 291, 288, 259.) Such a reason is appropriate and clear and convincing. An ALJ may rely on the conservative nature of treatment or a lack of treatment in rejecting a claimant's subjective complaint of pain. Johnson v. Shalala 60 F.3d 1428, 1433-34 (9th Cir. 1995).

1    Likewise, the evidence of record was consistent with his

2    conclusion that there was very little in the way of objective

3    medical findings that would corroborate her testimony of severe

4    peripheral neuropathy in her arms. (A.R. 21.) For example, Dr.

5    Hylton, a neurologist, opined in February 2001 that although the

6    neuropathy had affected Plaintiff's hands, she was advised only

7    "to avoid any type of repetitive hand use during the day, in

8    order to control for pain management." (A.R. at 244.) This is

9    inconsistent with a complete disability based on her hands. Lack

10   of support in the medical evidence of record is an appropriate

11   reason to reject subjective complaints, although it cannot be the

12   sole reason. <u>Moisa v. Barnhart</u>, 367 F.3d 882, 885 (9th Cir.

13   2004); <u>Morgan v. Commissioner</u> 169 F.3d 595, 600 (9th Cir. 1999).

14    Substantial evidence also supports his conclusion that her

15   assertedly totally disabling back pain was not reflected in the

16   medical evidence, which revealed only minimal degenerative

17   changes. (A.R. at 288, 327.) Likewise, Plaintiff has pointed to

18   no evidentiary insufficiency concerning the ALJ's finding that

19   there was no evidence of side effects associated with the use of

20   Plaintiff's various medications. (A.R. at 21.) Substantial

21   evidence also corroborated the general conclusion that the

22   medical record did not corroborate her being almost totally

23   nonfunctional during the day. (<u>Id.</u>)

24    The Court thus concludes that the ALJ's rejection of

25   Plaintiff's subjective complaints was undertaken pursuant to

26   correct legal standards and was supported by clear and convincing

27   reasons supported by substantial evidence in the record.

28   ////

30

1    VI. <u>Development of the Mental Health Record</u>

2    Plaintiff argues that the ALJ should have developed the

3    medical record because of Dr. House's giving Plaintiff a GAF of

4    60 and yet inconsistently failing to impose any restrictions on

5    Plaintiff. The duty to develop the record arises where the record

6    before the ALJ is ambiguous or inadequate to allow for proper

7    evaluation of the evidence. 20 C.F.R. §§ 404.1512(e) and

8    416.912(e); <u>Mayes v. Massanari</u>, 262 F.3d 963, 968 (9th Cir.

9    2001).

10   A GAF is a report of a clinician's judgment of the

11   individual's overall level of functioning and is used to plan

12   treatment and to measure the impact of treatment as well as

13   predicting its outcome. American Psychiatric Association,

14   <u>Diagnostic and Statistical Manual of Mental Disorders</u> at 30 (4th

15   ed.). A GAF does not have a direct correlation to the severity

16   requirements in the SSA listings of mental disorders. Revised

17   Medical Criteria for Evaluating Mental Disorders and Traumatic

18   Brain Injury, 65 F.R. 50746, 50764-65 (August 21, 2000). A GAF of

19   60 indicates moderate symptoms or moderate difficulty in social,

20   occupational, or school functioning. (<u>Id.</u> at 32.) However, the

21   ALJ relied on the March 2000 treatment record of Plaintiff's

22   generalized anxiety having significantly improved with the use of

23   Zoloft, (A.R. 19, 265), and the later December 2000 consultative

24   report of Dr. House, who formed a definite opinion that Plaintiff

25   could perform even complex job tasks, (A.R. 19-20, 173-78). There

26   was no inadequacy or ambiguity of the mental health record which

27   required further development by the ALJ.

28   ////

VI. <u>Restriction of Forceful, Repetitive Activities</u>

Plaintiff asserts that the limitation of no repetitive forceful pushing or grasping with either upper extremity was not supported by substantial evidence because nothing in the testimony supports it. Plaintiff argues that the matter should be remanded with instructions to delete the word "forceful" and to insert instead "occasional," or to reverse the case outright because the VE testified that preclusion of all but occasional pushing, pulling or grasping would render Plaintiff disabled.

Defendant does not address this contention.

The ALJ found that Plaintiff suffered diabetes mellitis with non-severe, mild peripheral neuropathy in both upper extremities. (A.R. 20.) He made further express findings regarding Plaintiff's claim of severe peripheral neuropathy in her arms. (A.R. 21.) He stated:

> The claimant alleged severe peripheral neuropathy in her arms; however, there was very little in the way of objective medical findings which would corroborate her testimony. While she does have limitations, she was not totally precluded from all types of work activity on or before September 30, 2000, and my conclusion in this respect is supported by substantial evidence in the record.... While sustained, strenuous exertion could be expected to aggravate the claimant's pain symptoms, I conclude she was capable of performing a limited range of sedentary work as described above, on and before September 30, 2000.

(<u>Id.</u>) The ALJ had previously described Plaintiff's RFC as prohibiting repetitive forceful pushing or grasping with either upper extremity. (A.R. 21.)

No medical expert expressly imposed a limitation on forceful repetitive activities. Neurologist Hylton opined in February 2001 that although the neuropathy had affected Plaintiff's hands, she

was advised only "to avoid <u>any</u> type of repetitive hand use during

the day, in order to control for pain management." (Emphasis

added.) (A.R. at 244.) The state agency physicians who evaluated

Plaintiff in December 2000 and May 2001 assessed no limitations

on the upper extremities but under manipulative limitations noted

there was some neuropathy and limited feeling due to decreased

sensation. (A.R. 182, 310.) In September 2002, Dr. Hylton opined

that with her right hand Plaintiff could occasionally perform

simple grasping, never perform fine manipulations, and

occasionally reach, handle, feel, push, and pull (Tr. 374-75). In

the same month, Dr. Hernandez opined that with either hand

Plaintiff could only occasionally engage in simple grasping, fine

manipulation, handling, pushing, and pulling; although she could

frequently reach and feel. (A.R. at 379-80.)

        In connection with the examination of the VE at the hearing,

Plaintiff's counsel asked the ALJ for clarification regarding the

no repetitive "forceful" grasping, pushing or pulling limitation

that the ALJ stated to the VE. (A.R. 84, 86.) The ALJ was asked

if it was from a specific reference. He replied:

> ALJ: No, it's something I concluded for this reason:
> She, she said that she has peripheral neuropathy in
> her hands, but I – as I went through the record, I couldn't
> really find much evidence to support in the hands,
> upper extremities as opposed to her legs, but I
> thought to err on the side of safety, I guess --
> ATTY: Then just --
> ALJ: --I would impose such a limitation.
> ATTY: All right. Just a, a few questions then.

(A.R. at 86-87.) Plaintiff's attorney then questioned the VE

about limitations concerning erosion of cashier jobs from the

forceful limitation and regarding occasional feeling, simple

grasping, and fine manipulation. (A.R. at 87-88.)

It is established that to the extent that medical evidence is inconsistent, conflicting, or ambiguous, it is the responsibility of the ALJ to resolve any conflicts and ambiguity. Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999). Because the ALJ has authority to interpret ambiguous medical opinions, Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993), the Court must defer to the ALJ's decision.

On the other hand, every functional restriction in an ALJ's formulation of a claimant's RFC must be supported by medical evidence. An ALJ may not determine a RFC to engage in sedentary work where the only medical opinion regarding the claimant's RFC was that the claimant was disabled. Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). An ALJ's opinion that a claimant could lift fifty pounds was not supported by substantial evidence where the ALJ relied only on the claimant's testimony, and the only medical evidence indicated disability. Stoglin v. Apfel, 130 F.Supp.2d 1060, 1065-66 (S.D.Iowa 2000). An ALJ may not determine a claimant's RFC based on the ALJ's own observations of the claimant at a hearing, the claimant's testimony, and the ALJ's own determination that her observable symptoms did not meet criteria stated in a medical textbook. Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975).

Here, there was no medical evidence concerning Plaintiff's ability to engage in forceful, as distinct from non-forceful, pushing, pulling or grasping. There was evidence that after Plaintiff's last insured date, Plaintiff's treating physician proscribed "any" type of repetitive hand use. However, the ALJ expressly rejected this, noting that the claimant had not been

precluded from all types of work activity and that it was
inconsistent with the clinical and laboratory findings of record.
(A.R. 20.) Concerning Plaintiff's upper extremities, there was
evidence that the state agency physicians concluded that
Plaintiff could perform work at the more demanding level of light
work; however, the ALJ explained that he instead viewed the
evidence "in a light most favorable to the claimant," and he
reviewed Plaintiff's subjective complaints and expressly
concluded that Plaintiff had some unspecified "limitations" (A.R.
at 21), adopted limits for carrying and lifting that were between
the two treating physicians' opinions, and adopted restrictions
of activities with the upper extremities that were more
protective than the state agency physicians' unlimited RFC, but
less severe than not only Dr. Hernandez's limits of only
occasional simple grasping and fine manipulation, handling and
pushing, but also Dr. Hylton's limits of occasional simple
grasping, reaching, handling, feeling, pushing, and pulling, and
no fine manipulation. The opinions relied upon constituted
substantial evidence because they were supported by evidence in
the record, <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1454 (9th Cir.
1984), and were not contradicted by all other evidence in the
record, <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995).

It does not appear, however, that there was substantial
evidence in the record for the portion of the RFC in which the
ALJ concluded that Plaintiff could not engage in repetitive,
<u>forceful</u> pushing, pulling or grasping. There was no medical
evidence whatsoever regarding the use of force in reference to
pushing, pulling, and other manipulative limitations. Thus, the

ALJ's assignment of the limit regarding forceful activities can not be interpreted as a simple resolution of an inconsistency or ambiguity; further, it was not a logical midpoint in any range of limitations that the various medical sources opined were applicable.

Plaintiff asserts that this means that the matter should be remanded or benefits be ordered outright. This is predicated on Plaintiff's assertion that the word "occasional" should be substituted for "forceful." However, the ALJ's findings and reasoning showed that he rejected the more protective limits of no occasional pushing, pulling or grasping; it was only repetitive forceful activities that he determined were proscribed. Thus, the VE's testimony that one who could only occasionally push, pull, or grasp could not perform the jobs in question is not pertinent because the ALJ rejected those more protective or severe limitations.

Although the ALJ's provision regarding forceful repetitive activities was not supported, Plaintiff has not demonstrated how this negatively affects the finding of no disability. Even with the invalid limitation on forceful activities, the record contains substantial evidence consisting of VE testimony that one who was <u>not</u> limited to only occasional pushing, pulling, or grasping could perform significant numbers of jobs.

Accordingly, the Court concludes that except with reference to the limitation on forceful activities, the ALJ's RFC rested on substantial evidence and was reached pursuant to correct legal standards. Plaintiff has not demonstrated that she is entitled to an order of an award of benefits or remand for further

1  proceedings.

2      VII. <u>New Evidence</u>

3      In her opening brief, in connection with combined

4  impairments, Plaintiff states:

5      The additional reports appended thereto (sic) support
       the opinion of Dr. Hernandez and some of the impairments
6      noted above (Exhibit 3).

7  Plaintiff appears to be asking the Court to review extra-record

8  evidence. Plaintiff cites no authority in connection with this

9  implicit request and thereby fails to comply with the intent of

10  this Court's scheduling order.

11      In any event, it is established that it is the burden of the

12  party seeking the Court to consider the evidence to show that the

13  evidence is material and probative of the party's condition at

14  the relevant time period, namely at or before the disability

15  hearing. <u>Sanchez v. Secretary of Health and Human Services</u>, 812

16  F.2d 509, 512 (9th Cir. 1987). Evidence is sufficiently material

17  to require a remand where it bears directly and substantially on

18  the matter in dispute, and it is such that there is a reasonable

19  possibility that the new evidence would have changed the outcome

20  of the Commissioner's determination had it been before the

21  Commissioner. <u>Mayes v. Massanari</u>, 276 F.3d 453, 462 (9th Cir.

22  2001). To demonstrate good cause, a claimant must demonstrate

23  that the new evidence was unavailable earlier. <u>Mayes v.</u>

24  <u>Massanari</u>, 276 F.3d 453, 463 (9th Cir. 2001).

25      The records in question relate to Plaintiff's condition in

26  August 2003 and January through July 2004. Plaintiff has not

27  demonstrated how any of these records are material and probative

28  of Plaintiff's condition on or before September 30, 2000.

1  Accordingly, the evidence will not be considered.

2  VIII. <u>Disposition</u>

3  Based on the foregoing, the Court concludes that in all
4  respects pertinent to the finding of disability, the ALJ's
5  decision was supported by substantial evidence in the record as a
6  whole and was based on proper legal standards.

7  Accordingly, the Court AFFIRMS the administrative decision
8  of the Defendant Commissioner of Social Security and DENIES
9  Plaintiff's Social Security complaint.

10  The Clerk of the Court IS DIRECTED to enter judgment for
11  Defendant Jo Anne B. Barnhart, Commissioner of Social Security,
12  and against Plaintiff Tammy Molina.

13

14  IT IS SO ORDERED.

15  **Dated:    February 16, 2006**                    **/s/ Sandra M. Snyder**
    icido3                                     UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28